UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| TONICSTAR LIMITED, | Civil No. 05-533 (JNE/JGL) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| LOVEGREEN TURBINE SERVICES, INC., FLINT HILLS RESOURCES LP, | |
| Defendants. | |

Bradley J. Ayers and Sonia L. Miller-Van Oort, **FLYNN GASKINS & BENNETT, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402; and Kelly L. Stoltz and Robert J. Franco, **BOLLINGER, RUBERRY & GARVEY**, 500 West Madison Street, Suite 2300, Chicago, IL 60661, for plaintiff Tonicstar Limited.

Chad A. Snyder and James S. Reece, **ZELLE HOFMANN VOELBEL MASON & GETTE**, 500 Washington Avenue South, Suite 4000, Minneapolis, MN 55415 for defendant Lovegreen Turbine Services, Inc.

Charles F. Webber, Rikke A. Dierssen-Morice, and Michael M. Krauss, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendant Flint Hills Resources LP.

Tonicstar Limited ("Tonicstar") seeks summary judgment on its request for a declaratory judgment regarding the scope of insurance coverage.[1]  As explained below, the Court grants the motion.

---

[1] In an Order dated May 2, 2005, the cases *Flint Hills Resources LP v. Lovegreen Turbine Services, Inc.*, Civil No. 04-4699 (JRT/FLN), and *Tonicstar Limited v. Lovegreen Turbine Services, Inc., and Flint Hills Resources LP*, Civil No. 05-533 (JNE/JGL), were consolidated for pretrial purposes pursuant to Fed. R. Civ. P. 42(a), and the Court heard dispositive motions filed in both cases on April 18, 2006.

# BACKGROUND

Defendant Flint Hills Resources LP's ("FHR") is a refining and chemicals company that owns and operates a crude oil refinery near Rosemount, Minnesota. On August 13, 2003, FHR and defendant Lovegreen Turbine Services, Inc. ("Lovegreen") entered into a Field Services Agreement (the "Agreement"). Under the Agreement, Lovegreen agreed to perform an overhaul on a gas compressor. The overhaul required Lovegreen to dismantle, inspect, service and rebuild the compressor. Lovegreen personnel began working on the overhaul on September 8, 2003, working on the compressor around the clock in two 12-hour shifts. In connection with their work on the compressor, Lovegreen personnel brought a 50-pound container of cloth rags to the job site, and they used the cloth rags to wipe the compressor during the overhaul.

On September 24, 2003, the overhaul was complete, and Lovegreen sent an employee to pick up Lovegreen's tools and materials, including the remaining cloth rags. On October 2, 2003, FHR reactivated the compressor, and the compressor seemed to be running normally.

One week later, on October 9, a portion of the refinery experienced a charge pump failure. The compressor is part of that portion of the refinery, and the charge pump failure caused the compressor to shut down. FHR re-started the compressor that same day, however, it was making a lot of noise and seemed to be excessively vibrating. FHR shut down the compressor because of the noise and vibration.

After FHR shut down the compressor, it inspected it to see what the problem was, and determined that a cloth rag was stuck inside the compressor. FHR alleges that the

cloth rag was one of Lovegreen's, and that Lovegreen personnel had left it in the compressor after they finished the overhaul. FHR employees began working on the compressor to remove the cloth fragments and return the compressor to operation. FHR did not call Lovegreen prior to inspecting or repairing the compressor. FHR claims that it did not call Lovegreen because it wanted to get the compressor running as quickly as possible.

Although FHR did not call Lovegreen prior to inspecting the compressor, FHR employees documented their inspection and repair of the compressor. They photographed the compressor while it was being disassembled, documented the rag fragments lodged inside the compressor, and saved the cloth fragments that were removed from the compressor. The compressor was returned to service on October 14, 2003, having been out of service for five days. FHR claims that as a result of the compressor failure and subsequent shutdown for repair, FHR incurred business interruption damages in excess of $6.5 million.

It is undisputed that Lovegreen used cloth rags in performing its work under the Agreement. It is also undisputed that Lovegreen did not have exclusive access to the area where the compressor was located. For example, another contractor, HydroChem Industrial Services, Inc. ("HydroChem") hydroblasted the deck near the compressor while Lovegreen was working on the overhaul.

After the compressor was returned to service, FHR worked to recover damages from insurers.[2] As of December 2004, the primary insurer, Liberty Mutual Fire Insurance Company, and five of the six subscribing London syndicates on Lovegreen's Lloyd's of London commercial umbrella policy, together paid almost $5 million of the $6.5 million in damages that FHR incurred. After the remaining syndicate, Tonicstar, refused to pay, FHR brought the underlying lawsuit against Lovegreen, raising claims for negligence and breach of contract. Both claims are premised on Lovegreen's alleged failure to perform work in a workmanlike manner by leaving a cloth rag inside the compressor. FHR seeks recovery from Lovegreen for business-interruption damages in the amount of $1.7 million dollars, as well as property damages for the repairs made to the compressor, totaling approximately $29,500. FHR makes no claims in the underlying action for property damage to any portion of the refinery, other than the compressor itself.

Tonicstar seeks a declaratory judgment that Tonicstar has no duty to defend or indemnify Lovegreen in the action filed by FHR.

## ANALYSIS

**I.   SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate in the absence of any genuine issue of material fact, and when the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of

---

[2] In 2003, FHR required contractors working on machinery at its refinery, including Lovegreen, to enroll in an Owner Controlled Insurance Program, which insured contractors under a primary general liability policy with a $2 million per "occurrence" limit, and an excess policy with $50 million per "occurrence" limit.

the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view all of the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See, e.g., Anderson*, 477 U.S. at 256; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995); *Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130, 1138 (D. Minn. 2003).

**II.    TONICSTAR'S MOTION FOR SUMMARY JUDGMENT**

Under Minnesota law, interpretation of an insurance contract is a question of law. *St. Paul Fire and Marine Ins. Co. v. Futura Coatings, Inc.*, 993 F. Supp. 1258, 1261 (D. Minn. 1998) (citing *Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997)). When interpreting insurance contracts, the court must ascertain and give effect to the intent of the parties as reflected in the insurance contract. *Jenoff*, 558 N.W.2d at 262. The insurance contract must be construed as a whole, with unambiguous language given its plain and ordinary meaning. *St. Paul Fire and Marine Ins. Co. v. National Real Estate Clearinghouse, Inc.*, 957 F. Supp. 187, 189 (D. Minn. 1997); *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993). Ambiguity exists if the language of the policy is reasonably subject to more than one interpretation. *Jenoff*, 558

N.W.2d at 262. Here, Tonicstar seeks a declaratory judgment that it has no duty to defend or indemnify FHR or Lovegreen.

The Court's task is to examine the language of the policy at issue and determine if the claimant's allegations in the underlying action are covered under that policy or instead fall within an exclusion to coverage. *Futura Coatings*, 993 F. Supp. at 1262. The policy at issue here is a commercial general liability ("CGL") policy, and defines the terms and exclusions relevant here. Based on its analysis of the policy, the Court concludes that FHR's allegations fall within the policy's "Property Damage to Your Work" exclusion, and therefore, Tonicstar has no duty to defend or indemnify FHR or Lovegreen in the underlying action.

The Court's analysis begins with an examination of the relevant policy language. The "Property Damage to Your Work" exclusion provides:

> This insurance does not apply to: Property Damage to: . . . . that particular part of any property that must be restored, repaired, or replaced because Your Work was incorrectly performed on it. . . . [this exclusion] does not apply to Property Damage included in the Products-Completed Operations Hazard.

Policy, § V.D.2.f. (as set forth in Endorsement 9 to the Policy). The Policy defines "Property Damage" as:

> Property Damage means (1) Physical injury to tangible property, including all resulting loss of use of the property. . . .; or (2) Loss of use of tangible property that is not physically injured.

Policy, § IV.K.1-2. The term "Your Work" is defined as:

> Your Work means: (1) work or operations performed by you or on your behalf; and (2) Materials, parts, or equipment furnished in connection with such work or operations. Your Work includes Warranties, representations made at any time with respect to the fitness, quality, durability,

performance or sue of Your Work; and (2) The providing of or failure to provide warnings or instructions.

Policy, § IV.N-O.

In the underlying complaint, FHR alleges that Lovegreen was hired to do an "overhaul" on the compressor, which required Lovegreen to "dismantle, inspect, service, repair, and rebuild" the compressor. FHR also alleges that this work also included a duty on the part of Lovegreen to inspect the compressor for foreign matter, such as a cloth rag, and remove it. Therefore, based on the allegations in the underlying complaint, the Court concludes that the Policy term "Your Work" refers to the overhaul, which includes a duty to inspect and remove foreign matter.

FHR asserts that Lovegreen performed its work incorrectly by failing to inspect for foreign matter, and therefore did not discover that its cloth rag was left inside. FHR alleges that as a result, the rag got stuck inside the compressor, and that FHR was forced to shut down the compressor and remove the rag fragments. As a result, FHR alleges that it sustained property damages to the compressor, which required FHR to incur the expense of repairing the compressor, removing rag fragments, and replacing parts in the compressor. FHR alleges that the shutdown and loss of use of the compressor caused substantial interruption to FHR's business, and caused FHR to lose significant revenue and income. The Court finds that the Policy term "Property Damage" here includes both the damage to the compressor itself, as well as the damage from the loss of use of the compressor.

Applying the allegations in the complaint to the terms as they are defined in the Policy, the Court finds that the Property Damage to Your Work exclusion applies here:

the Property Damage to Your Work exclusion states that the insurance does not apply to "Property Damage" to the compressor that must be "restored, repaired, or replaced" because Lovegreen's overhaul was incorrectly performed on it, when it failed to inspect for and remove the cloth rag.

However, there is an exception to the Property Damage to Your Work exclusion. Property Damage that is included in the Products-Completed Operations Hazard is excepted from the Property Damage to Your Work exclusion. The Policy defines the "Products-Completed Operations Hazard" as:

(1) Products-Completed Operations Hazard includes all Bodily Injury and Property Damage occurring away from premises you own or rent and arising out of Your Product or Your Work except: (a) products that are still in your physical possession; or (b) work that has not yet been completed or abandoned.

(2) Your Work will be deemed completed at the earliest of the following times: (a) When all of the work called for in your contract has been completed. . . .

(3) This hazard does not include Bodily Injury to Property Damage arising out of: . . . (b) the existence of tools, uninstalled equipment or abandoned or unused materials.

Policy, § IV.J.1-3. Therefore, whether the Property Damage to Your Work applies to the injury alleged here depends on whether the Property Damage is included in the Products-Completed Operations Hazard.

Although FHR alleges in the complaint that the compressor ran normally for roughly one week after Lovegreen finished the overhaul, which would otherwise place the injury alleged in the Products-Completed-Operations Hazard category, FHR claims that Lovegreen caused the damage by leaving a cloth rag in the compressor. Under

- 8 -

§ J.3.b. of the Policy, Property Damage caused by the existence of "abandoned or unused materials" is not included in the Products-Completed Operations Hazard. The Court finds that the cloth rag qualifies as "abandoned or unused materials" under § J.3.b. of the Policy, and therefore the property damage alleged by FHR is not included as a Products-Completed Operations Hazard.

Because the property damage here is not included in the Products-Completed Operations Hazard, the Property Damage to Your Work exclusion applies. As set forth above, Tonicstar has no duty to defend or indemnify FHR or Lovegreen based on that exclusion, unless the property damage was included in an exception to that exclusion. Therefore, because no exception applies to the injury alleged by FHR in the underlying complaint, Tonicstar has no duty to defend or indemnify Lovegreen or FHR.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Tonicstar's motion for summary judgment [Docket No. 50] is **GRANTED**;

2. The Court hereby **DECLARES** that Tonicstar has no duty to defend and no duty to indemnify Lovegreen with respect to claims made by FHR.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: August 25, 2006  
at Minneapolis, Minnesota.

                    s/John R. Tunheim  
                    JOHN R. TUNHEIM  
                    United States District Judge